Good morning. My name is Linda Ziskin. I'm the attorney for the plaintiff appellant Sidney Romanelli. Pure disbelief is no substitute for substantial evidence. That's what this Court said in the case of Benecke v. Barnhart, which is our guiding light for fibromyalgia cases. And this is a fibromyalgia case. What this is about really is whether or not one believes fibromyalgia is real. If you do, then the claimant's apparent inconsistencies and subjective reporting do substantiate that diagnosis and her level of impairment. If one does not believe that, as apparently the ALJ did not in this case, then one can find many, many inconsistencies and find against the claimant's credibility just because she has a disease that eludes objective measurement, as the Court said, as this Court said in Green-Younger. The ALJ, there's a conundrum in this case that really strikes me. The ALJ found Sidney Romanelli's fibromyalgia to be a severe impairment. Then he goes on throughout the decision to of symptoms. It can't be both ways. His disbelief, his sheer disbelief is palpable throughout this decision. And that's really, I think, what the crux of this case is. The other important, there's really three issues in this case. One is her credibility, of course. The second is rejection of the opinions of two treating doctors, which were in accord. And both of these doctors have opined that she cannot sustain full-time work. The reason for rejection of the treating doctor, a long-term treating doctor, and that's Dr. Powley, is that he filled out a questionnaire, a dreaded questionnaire, which seems to impugn his credibility. This questionnaire is a device that the attorney uses to get information from the doctor. This responsibility to obtain that information is really the ALJ's. He has an affirmative duty to recontact the doctor in case of questions or vagueness. And in this case, he did not do that. If he had any problems with the questionnaire, he was free to contact Dr. Powley. He chose not to do so. Well, did Powley treat her for fibromyalgia regularly? He did. I mean, I know he noted her history of it. Right. He noted at their first visit, he noted her long history of fibromyalgia. He decided Which is just a reporting of what she said. Right. I mean, I guess what I'm really looking for is any place in the record where he actually evaluated her or expressed sort of an opinion about the effect of her disease on the work. By sending her out for a consultation at OHSU, which is the Oregon Health Sciences University here in Portland, which has a very well-known fibromyalgia clinic. Dr. Davies at that clinic substantiated the diagnosis at Dr. Powley's request. After she did that, finding the criteria for fibromyalgia, which are set by the American College of Rheumatology, he then accepted that diagnosis and began to treat her with the drug that they recommended, which was Ultram. That's a drug that Dr. Davies said would be effective for fibromyalgia. Coincidentally, that was the drug that she was pulverizing from her husband to treat her headaches at first. I understand that. Let me come back and ask the same question again. Where is there in the record an indication from Powley that he diagnosed, of what his diagnosis was, that he was, or an evaluation on her ability to work? That occurs in the questionnaire, Your Honor. Well, where does he do that? I mean, he just checks off a couple of things. Where is there any substantive diagnosis or substantive evaluation by him about what work she could or couldn't perform? Well, if you're asking whether or not he clearly indicates it in his chart notes, I don't believe he does. But he treated her over a period of a number of years, treated her with the narcotic medication that was recommended for fibromyalgia. And it doesn't seem to me that there's a question in his mind after Dr. Davies rendered that diagnosis that she did indeed have fibromyalgia. I don't think, and I think you're right, Your Honor, he doesn't actually come out and say she has fibromyalgia. Okay. Well, then if we go, the other treating physician is the psychologist, Higgins Lee. And, I mean, it's not totally clear to me that the ALJ rejected her opinion. I mean, he acknowledged it. Right. And that didn't surprise me, too. So he didn't really reject it. Right. And here's the rub. She said that Sidney Romanelli could only work for six hours. She also said that she'd be limited to low-stress sedentary work. And at her age of 51, which is closely approaching advanced age, she would grid out under grid rule, I believe it's 20, 202.12, which is … Well, you know, what she said is subject can be read one of two ways. It can be read as either stating what an opinion is with respect to her work level, or it can be read as stating her willingness to discuss that possibility. Right. And that was … And there was no interpretation of the spin of that up to the ALJ. Right. Judge Marsh picked up on that in the U.S. District Court, and he found that the ALJ misinterpreted that comment. Either way you interpret it, it seems that Dr. Higgins Lee is saying that Mrs. Romanelli can only work for six hours. And that in and of itself establishes disability. And, again, I go back to the ALJ's affirmative duty to recontact the doctor. That was kind of a vague and confusing opinion she rendered. He should have recontacted her to clarify that. He never did. So he's not basing his decision on substantial evidence. But isn't there evidence in the record that she was able to engage in rigorous activities, which would suggest that she could perform the jobs the vocational expert identified? I don't believe, Your Honor, that the word rigorous was ever used anywhere in this case. She did engage in some activities that can be construed to be incompatible with disability. For example, she went to England with her sister. She did that. Tybo was the one that concerned me most. Tybo. I can do Tybo. Tybo, yoga, aerobic exercises like Tybo, or whatever other kind of tape you want to put in your VCR and follow along as best you can, is recommended as treatment. And aerobic exercise was recommended. Another little point that kind of gets me is that Judge Marsh characterized it. He may have used the word rigorous. I'd have to go back and check. But something similar to that, that it was strenuous aerobic kickboxing. I don't know where he got that, because I don't believe that my colleague here said that in her brief. I know that the ALJ didn't talk about Tybo being rigorous kickboxing. So here we have a Chenery problem, SEC versus Chenery, where it's the ALJ that's got to make these findings. The district court can't substitute its reasoning for that of the ALJ. And if Judge Marsh happens to know a little bit about Tybo, he can't really use that to change the ALJ's findings. So I don't believe that that part of Judge Marsh's decision comports with legal precedent. I'd like to reserve my time remaining unless you have any further questions for me. Thank you. Ms. Edwards. Good morning. Jamala Edwards, representing the Commissioner today. May it please the Court. I'd like to first address the interpretation of Dr. Higgins-Lee. That stuck out to me as, wait, did I read Judge Marsh's opinion wrong? And actually, when you go here, he says, I find, nonetheless, that the ALJ reasonably interpreted Dr. Higgins-Lee's overall opinion that Romanelli could work six hours a day. So I'm not really sure where the misinterpretation on Judge Marsh's part is, because he clearly said that. But going back, this case really is about someone who lives an active life, has received only conservative treatment for her impairments, and she's What's the standard treatment for fibromyalgia? Well, treatment would be exercise, light exercise, pain medication, trying to have, you know, loosening of your limbs and this type of thing. But here we show someone who is participating in Taibo, which is a vigorous kickboxing. Where is it in the record that it says that it's vigorous kickboxing? I have no idea what Taibo is. I don't even know what Of the So where is it in the record that it says that Taibo is vigorous kickboxing? Well, I suppose that would be more something that the court could take administrative notice of if they have seen that What case says that I could take judicial notice that Taibo is vigorous kickboxing? Well, I suppose there isn't one that's exactly on point regarding Taibo So there's nothing in the record here about what Taibo consists of. Isn't that correct? There's no definition of Taibo in the record. And we don't know to what extent in this record she even performed Taibo. Well, she did say that she, let's see, well, she performed, she walked two to three, well, no, for Taibo, if you're asking me about Taibo, no, not exactly. But she did say she had various other activities. She walked two to three times a week. She could garden. Why is it inconsistent with the treatment for Taibo, I mean, for fibromyalgia? Well, the treatment that was suggested to her was light exercise. It's reasonable to So she shouldn't engage in any walking then? No, but if she could walk for a couple miles at a time, that she could perhaps, well, what she said in the record was after 15 to 20 minutes of either standing or sitting that she had an onset of pain that was so strong that she could not bear it. And that's really inconsistent with the ability to walk one to two miles at one time, to walk three times a week at that, to garden one and a half hours at a time. Even her own husband testified that she needed three hours before needing a rest, that she could sit for two hours, that she did yard work. She worked on the computer for 30 to 45 minutes. That's inconsistent with her own testimony. She's also been counseled many times in the record by Dr. Pally, who we discussed today, on her use of narcotic pain medication. And Judge Marsh found that the ALJ's assertion that she was looking for a diagnosis to feed her narcotic addiction was not unreasonable, given the history of the record. Dr. Pally even said, I want you to sign this pain contract before I will give you any more medication. The Ultram that my esteemed colleague said was the prescription, was the one that she was stealing from her husband, which Dr. Pally and her had an argument about. They said in the record, we had to call a truce, and we'd come back to it next time. Isn't there evidence in the record that when she was, what was suggested to her at one point, that she'd take Vicodin, that she said, that's not a drug I should take, because I've had problems with addiction with Vicodin. Well, I believe Dr. Pally said, given her tendency to abuse pain meds, that that would be a good idea for her not to do that. How does that support, the ALJ said, well, she's just looking for a diagnosis that will allow her to feed her addiction. What in the record really supports that? Well, prior to the fibromyalgia, going to the rheumatologist, Dr. Davies, getting the diagnosis, she had gone to Dr. Pally for migraine headaches, for other type of routine appointments, and had received a prescription for a narcotic medication. Then, all of a sudden, you know, a while later, she goes to Dr. Pally and says, I'm going to seek disability benefits for fibromyalgia. And Dr. Pally says, well, wait here a second. Before we go on this disability path, and I help you with the paperwork, or we do this diagnosis, let's send you to a rheumatologist, seek treatment first, see if you can get better before we seek disability. And she had already had a pattern of taking narcotic medication at that point. And at that beginning stages of talking about disability with Dr. Pally, that is when Dr. Pally was counseling her about her overuse of narcotic medication. So the coincidences and the kind of interweaving of the two together shows a pattern that that might be. I thought there was something in Dr. Pally's notes that when he first saw her, she reported to him, or he had reviewed other doctors' notes that she had been diagnosed with fibromyalgia. He said there's a long history of fibromyalgia. I thought he made reference to other doctors' records. He actually said in the record that it seems to imply, it seems to suggest fibromyalgia, but there is no diagnosis, there has been no actual treatment for this. But it seems to imply that. Well, I got the impression that it was not just her statements to him that she had fibromyalgia, but that he reviewed some other medical records that allowed him to make that statement in his records. Right. Is that right? Well, he says actually, here, he says, records from her previous physician allude to the diagnosis, but I'm unable to find the examination that confirmed clinically that impression in the previous physician's mind. And that's on transcript site 132. So that's what he... And his records didn't contain those prior records that he was relying upon. No. Nor were they presented to the ALJ separately. No. And there's been a reference to recontacting, recontacting the physicians. We need to speak to the physicians and clarify this, Dr. Higginsley and Pally. Well, here the ALJ had substantial evidence upon which to make a decision. The credibility, the conservative treatment, the lay witness testimony, all pointed that she had a greater ability. It's the plaintiff, or Ms. Romanelli's, burden in this case to bring forth all evidence that supports her claim for disability. The commissioner can't go on some kind of wild goose chase or hunt over records that might not even exist. The Dr. Pally says, I'm not sure if they exist or not. What was wrong with the fibromyalgia disability limitation? What was it called? The fibromyalgia residual functional capacity questionnaire that was provided by the lawyer. By the one that Dr. Pally filled out? That Dr. Pally filled out. Well... Not so much filled out, it was a check the box. Right. A lot of it was a check the box. There were some areas for him to comment. The ALJ basically discredited that. Said he wasn't even given any weight. Well, he didn't offer any objective support. Basically, it was a recitation of her subjective allegations or her subjective impairments. She said, I felt this way, I felt this way. And the question was, Dr. Pally, is this consistent with what she could have if she had fibromyalgia? And he said, yes, yes, yes. And although there was space, there were lines for him to offer objective support, all he did was say, yes, check this, check that. Basically, just... His notes after that reflect that he writes in his notes that he reviewed each and every item on the questionnaire with Ms. Romanelli. Mm-hmm. Well, they are still no more than her assertions of how she's feeling. And they aren't clinical evidence. They aren't objective evidence. And when you review his records, they don't... Our case law says that there's really... Our case law recognizes that these kinds of questionnaires are entirely appropriate in Smolin. Mm-hmm, right. They say brief and conclusory evidence. The ALJ can... Well, questionnaires of this type. Mm-hmm, right, correct. They have leading question. Check the box. Correct. I agree with you completely. They don't offer... So I want to know kind of what's so terrible about this check the box form. In general or this specific one? This specific one. Well, as I've said, I believe that this one the ALJ found was nothing more than the plaintiff or, you know, Ms. Romanelli saying, I feel tired when I do this. I feel they were... They weren't any objective diagnosis. Let's give fibromyalgia can cause this. And this is what her functional limitations are. There were no functional limitations assessed. Okay. Are there no further questions? Anything else? Okay, thank you. Thank you very much. Ms. Siskin? I'd like to quickly touch on a few points. Judge Paez, you made several that I'd like to address. First of all, there's nothing wrong with a questionnaire. The agency sends them out all the time. And if the agency were to reject check the box forms, then it would just have to do away with all of the medical source statements. But if the check the box form doesn't say anything substantive, it's okay not to give it a whole lot of weight, isn't it? Yeah, and I really don't want to call this a check the box form because it had plenty of room in it for the doctor to render his opinion. It had blank lines, and he did scribble in the margins when he disagreed with something that the claimant said. Yes, it was for subjective reporting, but again, in Green-Younger, we know that that is the way that fibromyalgia is evaluated. So we go back to the question, do we believe in fibromyalgia? If we do, then the check the box form, which is really much more than that, is perfectly appropriate. Also, the misinterpretation that I was talking about where Judge Marsh talks about Dr. Higgins-Lee, that's on the excerpts of record, page 19. He clearly says that the ALJ misinterpreted. He buys that. So whether or not we want to buy that doesn't really matter because what she said was six hours, semi-skilled sedentary, low stress, i.e. simple work. If you look at that and the grid rule, she's 51 at the time of the decision, or the time of the adjudication even, she's 52. That means that she should grid out. But six hours also, just in and of itself, is not full-time work and that is equal to a finding a disability. We talked about walking two miles. I don't think it was two miles. I believe it was less than that, half a mile to one mile. Walking is pretty easy exercise and that's one of the main exercises for fibromyalgia. She is in a real conundrum here. She's told to exercise. When she does, they use it against her to impugn her credibility. She can't win. Again, there's no indication that Tybo really is all that strenuous. I see my light is red, but I would like to just touch on the use of narcotics because that really went to her credibility. The drug that she supposedly abused was Ultram. This is prescribed for fibromyalgia. She wasn't drug abusing. She was seeking to quell her pain. She used some of her husband's medication that was in the medicine cabinet. It ended up that after Dr. Powley yelled at her, he turned right around and prescribed it for her. She's not really abusing drugs and I think we need to move away from that characterization. Thank you, counsel. Both of you, the matter just argued will be submitted.
judges: Rymer, Paez, Carney